# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| *Plaintiff* | )<br>) |
| v. | ) No. 19 CR 876<br>) |
| LUIS DUARTE, | ) Judge Virginia M. Kendall<br>) |
| *Defendant.* | ) |

## MEMORANDUM OPINION AND ORDER

Defendant Luis Duarte is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). This charge resulted from an encounter with Chicago Police Officers on March 27, 2019 during which the Officers approached Duarte on the street, seized a firearm from his person, and arrested him. Duarte moved to suppress the firearm as evidence, claiming the Officers lacked reasonable suspicion to stop and frisk him. On March 19, 2021, the Court held an evidentiary hearing after which the parties were given an opportunity to submit supplemental briefing. For the following reasons, Duarte's motion to suppress [57] is denied.

## BACKGROUND

At the evidentiary hearing, the parties presented the testimony of Chicago Police Department Officers Aaron David and Andrew David, body-camera footage of the events in question, and the relevant police report and ShotSpotter [1] reports. The video and documentary evidence is generally consistent with the Officers' testimony, but relevant inconsistencies are noted.

---

[1] ShotSpotter is an audio sensory technology that detects gunfire and sends alerts to law enforcement. (Dkt. 69 at 12).

1

Around midnight on March 27, 2019, Officers Aaron and Andrew were on patrol in an unmarked SUV, in the 26th Street and Pulaski area. (Dkt. 69 at 7). The Officers were investigating reports of five gunshots half a mile away between 10:52 P.M. and 11:01 P.M. (*Id*. at 7–9, 14–15, 55–56). At the time, both Officers were assigned to the 10th District tactical team, designed in part to patrol gang areas in the district. (*Id*. at 6, 54). Officer Andrew had served on the team for four years and Officer Aaron for a few months. (*Id*. at 7, 58). The 26th and Pulaski area is the border between two gangs in the 10th District: Latin Kings and Two-Six. (*Id*. at 11–12). Two-Six members are known to carry firearms. (*Id*. at 20).

While patrolling, Officer Andrew saw a man, later identified as Defendant Luis Duarte, walking westbound on the north sidewalk of 26th Street and east of Harding. (*Id*. at 18, 57). As the Officers' vehicle passed Duarte, Officer Andrew observed the front of Duarte's body and recognized him as a Two-Six gang member whom Andrew had seen both in person and in police databases. (*Id*. at 18, 57–58). Duarte was wearing a black hoodie and pants. (*Id*. at 19, 59). Officer Andrew asked Officer Aaron to swing back around to get a closer look at Duarte. (*Id*. 19, 59–60).

Right then, the Officers also observed two males standing on the south side of 26th Street. (*Id*. at 20–21, 60). Officer Aaron pulled over and Officer Andrew briefly spoke with them. (*Id*. at 21–22, 60). When asked if they had heard any gunshots, the men pointed towards Harding in the direction the Officers had previously seen Duarte. (*Id*. at 22, 60). [2] When the Officers looked in that direction, they saw Duarte walking down the street, now, in the opposite direction. (*Id*. at 22, 63). Officer Andrew noted in his police report that Duarte "quickly turned 180 degrees away from [officers] and began to swiftly walk eastbound on 26th St." (Dkt. 58 at Ex. A).

---

[2] Officer Andrew did not mention speaking with these men in the police report he prepared after Duarte's arrest. (Dkt. 69 at 47–48, 61) (Dkt. 58 at Ex. A). Nonetheless, because the report does not contradict the Officers' testimony that they spoke with the men, the Court credits their testimony.

At that point, at approximately 12:30 A.M., both Officers initiated their body-worn camera footage and approached Duarte in their vehicle from behind. (*Id*. at 25–26, 38, Video Ex. 1 and 2). The Officers pulled up 10 to 15 feet behind Duarte, exited their vehicle, and began to approach him on foot. (*Id*. at 25). They walked at a normal speed and without their weapons drawn. (*Id*. at 26–27, Video Ex. 1 and 2). They were wearing vests with police insignia on the back and a large star badge on the front. (*Id*. at 8, Video Ex. 1 and 2). Officer Aaron called out to Duarte "in a calm voice" and asked if Duarte would speak with them. (*Id*. at 26). Officer Aaron testified that he did not order Duarte to stop or issue any commands, because, "I just wanted to speak to him. I wanted to keep the encounter consensual. I didn't want to spook him. I just was trying to be cool with him." (*Id*. at 27). Duarte began to turn around to face the Officers, at which point, they observed a weighted object in the front pocket of his hoodie "consistent with the size and shape of a firearm." (*Id*. at 27, Video Ex. 1 and 2); (Dkt. 58 at Ex. A).[3] Duarte turned to fully face the Officers, raised his hands, and began to remove his hoodie. (Dkt. 69 at 28, 50, Video Ex. 1 and 2). Officer Aaron testified that this was "an indication to me that [Duarte] might be either trying to fight me or is doing something suspicious." (*Id*. at 51). Officer Andrew noted in his police report that he interpreted this as "an attempt to abandon" the sweatshirt. (Dkt. 58 at Ex. A). As Duarte raised the hoodie over his head, Officer Aaron noticed that "the pocket sunk down, and it was still hanging with the weighted object in it." (Dkt. 69 at 51). Officer Aaron grabbed Duarte's left hand and the sweatshirt pocket, in which he felt the weighted object. (*Id*. at 28–29). After confirming the object had the size and shape of a firearm, Office Aaron yelled "pole," meaning gun. (*Id*. at 29, 34, Video Ex. 2). Officer Aaron took the hoodie from Duarte and Officer Andrew handcuffed him. (*Id*. at

---

[3] Officer Andrew testified that he saw the bulge in Duarte's pocket right before he got out of his vehicle. (Dkt. 69 at 64–65). The body camera footage confirms, however, that the bulge was not visible until after the officers exited their vehicle and Duarte turned to face them. (*Id*. at Video Ex. 1 and 2). Thus, the Court discredits this testimony by Officer Andrew and credits Officer Aaron's testimony which is consistent with the video evidence.

Video Ex. 1 and 2). Officers determined the object in the hoodie was a revolver with three spent shell casings. (*Id*. at 29). Upon questioning, Duarte admitted to being a Two-Six member and a convicted felon. (*Id*. at 35, Video Ex. 1 and 2); (Dkt. 58 at Ex. A).

## **DISCUSSION**

### I. Seizure

Duarte moves to suppress the gun seized by Officers Aaron and Andrew because the Officers lacked reasonable suspicion to conduct an investigatory *Terry* stop and subsequent frisk. The threshold issue is at what point the encounter between Duarte and the Officers became a seizure under the Fourth Amendment. "A seizure occurs within the meaning of the Fourth Amendment if, in the totality of the circumstances, a reasonable person would not feel free to disregard the police and move along." *United States v. Howell*, 958 F.3d 589, 597 (7th Cir. 2020). "Relevant factors include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Palomino-Chavez*, 761 F. App'x 637, 642 (7th Cir. 2019) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Duarte maintains he was seized when the Officers approached him and "ordered him to stop." (Dkt. 57 at 4). Neither Officer, however, ordered Duarte to stop or issued any other command. Rather, Officer Aaron, "in a calm voice," asked Duarte if he would speak with them. (Dkt. 69 at 26). The Officers did not have their weapons drawn, were approaching Duarte at a normal pace, and had not expressed any indication of touching him. (*Id*. at 25–26, Video Ex. 1 and 2). Officer Aaron testified, that his specific intention in approaching Duarte was "to keep the encounter consensual" and not "spook" Duarte into running away. (*Id*. at 27). Duarte presented no

evidence at the hearing to rebut this testimony. Under these circumstances, the Officers' initial approach and verbal request to speak with Duarte cannot be construed as initiating a seizure. *See e.g., United States v. Williams*, No. 19 CR 00662-1, 2021 WL 25550, at *3 (N.D. Ill. 2021) ("No quantum of suspicion was needed to get out of the cars and start to approach [Defendant]" where "officers did not approach aggressively or otherwise instruct [Defendant] to stop."). Instead, a seizure did not occur until Officer Aaron grabbed Duarte's left arm and front hoodie pocket.

## II. Reasonable Suspicion

The remaining question is whether the Officers' seizure and search of Duarte were supported by reasonable suspicion. "[T]he Fourth Amendment permits law enforcement to conduct a brief investigative stop[,]" or *Terry* stop, "when an officer reasonably suspects a person is engaged in criminal behavior." *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019). "While inarticulate hunches are not enough, reasonable suspicion is a lower threshold than probable cause and considerably less than preponderance of the evidence[.]" *Id.* (internal quotations and citations omitted). To determine whether reasonable suspicion existed, courts must consider the "totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (internal quotations and citation omitted). "Reasonable suspicion can arise from behavior that may in other circumstances be considered innocent; in other words, context matters." *Id.* (internal quotations and citation omitted).

Here, at the time they approached Duarte, Officers Aaron and Andrew knew the following: (1) gun shots were fired half a mile away an hour and half earlier; (2) Duarte was walking down the street past midnight in a neighborhood frequented by gang violence; (3) Officer Andrew recognized Duarte as a Two-Six gang member; (4) Two-Six gang members carry guns; (5) two

individuals indicated they heard shots coming from the direction Officers had previously seen Duarte walking; and (6) Duarte changed directions after the Officers initially passed him in their vehicle and was "swiftly walking" away from them. (Dkt. 69 at 11–15, 20, 57–60, 63) (Dkt. 58 at Ex. A). Then, as they approached Duarte on foot, the Officers noticed a weighted object in Duarte's front hoodie pocket consistent with the size and shape of a firearm, and, almost immediately thereafter, Duarte attempted to remove his hoodie. (*Id*. at 27–28, Video Ex. 1 and 2) (Dkt. 58 at Ex. A). Officer Aaron testified that this behavior was in particular concerning because it "indicat[ed] to me that [Duarte] might be either trying to fight me or is doing something suspicious." (Dkt. 69 at 51). Similarly, Officer Andrew noted in the police report that he interpreted Duarte removing the hoodie as "an attempt to abandon" it. (Dkt. 58 at Ex. A). These conclusions are particularly reasonable in light of the fact that Duarte began to take off his hoodie right as he saw the Officers. (Dkt. 69 at 27–28, Video Ex. 1 and 2). Both Officers were wearing protective vests with large star badges on them (*id*. at 8), making it likely that Duarte recognized them almost immediately as law enforcement. *See e.g.*, *Williams*, 2021 WL 25550, at *5 (that officer "wore a vest with a large police star on its front" was evidence that suspect knew he was being approached by law enforcement). These facts, taken together, give rise to reasonable suspicion that Duarte may have had a weapon or been involved in a shooting. *See, e.g., United States v. Wilson*, 963 F.3d 701, 703–04 (7th Cir. 2020) (finding of reasonable suspicion supported in part by "conspicuous bulge" in suspect's pocket, presence in high-crime area, recent report of crime in the area, and suspect's evasive behavior); *United States v. Richmond*, 924 F.3d 404, 411–14 (7th Cir. 2019) (finding of reasonable suspicion supported in part by gun-like bulge in suspect's pocket, presence in high-crime area, and suspect's evasive behavior upon seeing police); *United States v. Luckey*, No. 20 CR 313, 2021 WL 271295, at *5 (N.D. Ill. Jan. 27, 2021) (finding of reasonable suspicion

supported in part by fact that suspect attempted to abandon firearm before interacting with officers in a high crime area).

Immediately after grabbing Duarte's left arm, Officer Aaron frisked Duarte's front hoodie pocket, identified an object consistent with a firearm, and seized the hoodie along with the gun. "In the course of an authorized investigatory stop, an officer may proceed to conduct a protective pat down when confronting facts and circumstances giving rise to a reasonable suspicion that the individual has a weapon and otherwise poses a danger." *Adair*, 925 F.3d at 937. While an investigatory stop does not automatically entitle law enforcement to conduct a protect pat down, *see id.*, because the frisk in this case occurred simultaneously to the investigatory stop, the reasonable suspicion supporting the stop also supports the frisk. As discussed above, at the time Officer Aaron grabbed Duarte's arm and front hoodie pocket, the Officers had reasonable suspicion that Duarte might possess a gun. The pat down of Duarte's front pocket to secure that suspected weapon was "the least intrusive means" to address this safety concern. *Ruiz*, 785 F.3d at 1143 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Thus, Officers Aaron and Andrew had reasonable suspicion to stop and frisk Duarte and seize his firearm.

## CONCLUSION

For the reasons stated above, Duarte's motion to suppress gun evidence [57] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: May 12, 2021